John JACKSON, Plaintiff-Appellant,

v.

PEPSI–COLA, DR. PEPPER BOTTLING CO., a DIVISION OF RKO BOTTLERS OF TOLEDO, INC., Defendant-Appellee.

No. 85–3232.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 3, 1985.
Decided Feb. 10, 1986.

Dennis P. Strong, Bayford, Senerius, Vaporis & Strong, Gordon A. Senerius (argued), Toledo, Ohio, for plaintiff-appellant.

Peter R. Casey, III (argued), Eastman & Smith, Toledo, Ohio, for defendant-appellee.

Before KEITH and MILBURN, Circuit Judges, and UNTHANK *, District Judge.

KEITH, Circuit Judge.

Appellant John Jackson, a black male, appeals from a judgment in favor of RKO Bottlers in this Title VII discrimination case tried without a jury by Judge Potter. This Court previously heard this case, *Jackson v. RKO Bottlers of Toledo,* 743 F.2d 370 (6th Cir.1984), and remanded on the basis that the district court erroneously concluded that plaintiff had not established a prima facie case pursuant to *McDonnell-Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Specifically, the trial court erroneously found that plaintiff had not proved he was qualified for the job of plant superintendent. Plaintiff claims he was not promoted to plant superintendent due to racial discrimination, and that he was unlawfully discharged on December 1, 1980, in retaliation for his having filed discrimination charges. Plaintiff originally filed his lawsuit November 15, 1978.

On remand the trial court accepted plaintiff's prima facie case. Nevertheless, the court determined plaintiff could not prevail because there were legitimate, nonpretextual reasons, proffered by RKO, which adequately explain why he was not promoted. Furthermore, the district court found plaintiff was discharged not in retaliation for filing discrimination charges, but for "as-

* Honorable G. Wix Unthank, U.S. District Court for the Eastern District of Kentucky, sitting by designation.

saulting" an hourly employee in the parking lot after previously being warned that such action would result in his termination. We affirm, finding the decision below rendered by Judge Potter was not clearly erroneous.

## I. THE PROMOTION ISSUE

The appellant, John Jackson, began working for the predecessor of RKO Bottlers, Variety Club Beverage Company, of Toledo, Ohio, as a laborer in 1951. In 1966, the Variety Club Beverage Company was purchased by RKO for bottling and distributing Pepsi Cola. The plant superintendent at that time was Daniel Starsky. The general sales manager was Robert Johnson. Following the purchase, a decision was made by RKO to build a new bottling and distribution facility, known as "Hill Avenue".

In early 1978, Starsky, the plant superintendent, was offered the position of managing the RKO Bottling facility in Muncie, Indiana, and Johnson was faced with a decision as to the future operating method of the Toledo facility. The stage was thus set for the crux of plaintiff's complaint: why was he not promoted to plant superintendent? Plaintiff claims it was due to impermissible racial discrimination. We disagree.

Originally, Johnson decided to employ a "team management" concept, rather than use a plant superintendent. This system is frequently used within the bottling industry, and is used by the Pepsi-Cola Bottling Group. There is conflicting evidence as to whether the "team concept" was a contest to see which of three individuals, Kerner, a white, Jackson or Taylor, would succeed Starsky as plant superintendent. However, the system did not work, and Johnson decided to return to a plant supervisor system. The choice for plant supervisor came down to Jackson or Kerner, although Mr. Taylor was given slight consideration.

The district court found that Johnson was familiar with Kerner because they had worked together at the Variety Club prior to the opening of the Hill Avenue facility, and he knew Kerner's achievements and responsibilities as a warehouse supervisor at Hill Avenue. Johnson was also aware of Jackson's duties and responsibilities at the Variety Club and had a great deal of contact with Jackson between 1969 and 1978.

The evidence as to who would have made the better plant superintendent, Jackson or Kerner, was conflicting. Johnson felt that Kerner was the more qualified to be plant superintendent because he was experienced in all phases of the business. Kerner was experienced in warehousing, and had straightened out the warehousing situation after being brought to Hill Avenue from Variety Club. He had sales experience, which Johnson felt was important to understanding the total scope of the operation. Kerner had successfully run the complex Variety Club operation where he had responsibility for production, warehousing, and quality control.

In contrast, Jackson had little or no involvement in quality control at Variety Club, and no direct involvement at Hill Avenue. During the period of time that Kerner was running the entire Variety Club operation, Jackson was running merely one line at Hill Avenue. Jackson had no night warehousing experience, and he had no sales experience. Jackson had also been criticized on occasion for his handling of employees on a day-to-day basis. He was not familiar with stock ordering, forecasts, or budgets. Johnson also felt that, during the "team concept" period of management, Jackson was trying to operate production in the same manner as Starsky, and Johnson did not wish that type of management to continue.

Although Starsky testified that he would have made Jackson plant superintendent had the decision been his, this decision was based primarily on Jackson's personal loyalty to Starsky. Even Starsky believed Kerner had more total experience in running the plant operations. The district court found that Johnson's decision to promote Kerner over Jackson was based on Kerner's overall greater experience in the bottling industry, and that racial animus

did not play a part in the promotion decision.

## II. THE RETALIATORY DISCHARGE ISSUE

In 1976 an incident occurred between an hourly employee, McGee, and Jackson, who was a supervisor at that time. Jackson had given McGee instructions and McGee started swearing at him. When McGee approached Jackson, Jackson grabbed McGee and pushed him away. This incident was observed by John McCullum, who was a union steward. McCullum brought the incident to the attention of Bob Johnson, who at that time was general manager. Johnson spoke to both McGee and Jackson in McCullum's presence, and heard their versions of what had occurred. Johnson told McGee that he was wrong for swearing at Jackson, and told Jackson that if he ever laid hands on another hourly employee, he would be fired. In May of 1979 Jackson grabbed the shoulders of a female production employee, Carol Cowell, as if to kiss her, and, later that day when the same employee requested that Jackson sign her time card, Jackson responded "for a little sugar, anything can be done around here". This incident was brought to Johnson's attention, and he called Ms. Cowell to his office. Johnson asked Ms. Cowell if she wished to sign a complaint against Jackson, and she indicated no. Johnson told Cowell to think about her decision for a few days. Subsequently, Ms. Cowell told Johnson that Jackson had apologized to her and that she wanted to drop the matter and forget it. Johnson did not pursue the matter further. Jackson argues that Johnson's query to Ms. Cowell to "think over" her decision not to lodge a complaint, indicates that RKO was out to "get him" in retaliation for his filing suit.

In November of 1980 the RKO facility was involved in a bitter labor dispute. On Saturday, November 22, 1980, the day after the strike ended, Frank Taylor, Robert Haas, an hourly paid maintenance mechanic, and another employee had ridden to work together. The television sets were set up in the plant so that the personnel could watch the Ohio State-Michigan football game. On previous occasions Haas and Jackson had bet with each other on football games. When Haas lost a bet it was his practice to pay Jackson the following Monday, and Jackson testified that he never had any concern about Haas paying on his bets. That Saturday Haas and Jackson discussed betting on the game, but Jackson wanted Michigan and points and Haas refused to bet.

At the end of the day and after the conclusion of the game, when Haas, Taylor and another employee were leaving the plant, Jackson asked Haas for $5.00 on his bet. Haas replied that they didn't have a bet and continued out of the plant. As the three got to Haas' car, Jackson came out of the plant hurriedly and again yelled to Haas "Where is my $5.00?" Haas again replied that he didn't have his $5.00 and that they did not have a bet. Jackson ran up to Haas and twice pushed his hand away from the lock as Haas was trying to open the car door. Jackson had Haas pinned against the side of the car with his body. Jackson then grabbed Haas in the chest area and spun him across one or two parking spaces and then pinned him up against another car. Taylor asked Jackson to let Haas go and also motioned for three security guards, who were sitting in a vehicle across the parking lot, to come over. As the guards approached, Taylor again asked Jackson to let go of Haas and Jackson then complied. Although Jackson considered this incident mere "horseplay", Haas did not, and the incident was reported to Johnson.

The following Monday, Johnson spoke individually with Taylor, Haas and Jackson. He also spoke with one of the guards and requested and read the reports of the other two guards concerning the incident in the parking lot. Jackson told Johnson that the incident had been in fun, but both Haas and Taylor told Johnson that they felt that Jackson had been serious. Johnson concluded that the incident was not mere "horseplay", and that it had broken all the

rules of good supervisory procedure since supervisors were expected to set an example for the rest of the plant community. Johnson had previously discussed with his supervisory personnel that any physical contact with an hourly employee was absolutely forbidden. Jackson had been previously warned, after the McGee incident, that he would be fired if he again laid hands on an hourly employee. On December 1, 1980 Jackson was fired because of the incident in the parking lot.

## DISCUSSION

▬ In Title VII cases, plaintiff carries the ultimate burden of proving racial discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207. Once the plaintiff has proved his prima facie case of racial discrimination under *McDonnell-Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),[1] the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's rejection. The plaintiff then has an opportunity to prove that these "legitimate" reasons were mere pretext. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. In the instant case, plaintiff proved his prima facie case regarding the promotion to plant superintendent. The defendant articulated legitimate, non-discriminatory reasons for not promoting plaintiff. Namely, Kerner was more qualified for the position due to his overall breadth of experience. This finding of fact was not clearly erroneous. Plaintiff failed to prove that the reasons articulated by defendant were pretextual. Accordingly, we affirm the district court's holding in favor of RKO.

▬ Plaintiff, likewise, does not prevail on his claim of retaliatory discharge. To establish a prima facie claim of retaliatory discharge, plaintiff must establish: (1) that he engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) that he was subject to adverse employment action subsequent to or contemporaneous with his protected activity; (3) there is a causal connection between the protected activity and the adverse employment action. *Burrus v. United Telephone Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.1982), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). If a prima facie case is established, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. The plaintiff may rebut defendant's "legitimate" action by demonstrating the articulated reason was a mere pretext for discrimination. *Id.* at 343. Even assuming plaintiff has established a prima facie case, defendant prevails for it has proffered legitimate, nondiscriminatory reasons for discharge. Namely, the incident in the parking lot with Haas after previously being warned that "laying hands" on an hourly employee would result in his termination. Plaintiff has failed to produce any credible evidence that this legitimate reason for his termination was mere pretext. Plaintiff claims that Johnson's query to Ms. Cowell to "think over" her decision not to lodge a complaint against Jackson indicates "bad faith" on RKO's part, and is indicative of pretext. We disagree. Logic dictates that if RKO wanted to fire Jackson, they would have simply done so without any "set up" which would possibly subject RKO to a sexual harassment suit and adverse publicity. Furthermore, the time span of over one year from the time Johnson filed suit, to the time of his firing, militates against a finding of retaliatory discharge.

Accordingly, we affirm the decision of Judge John W. Potter.

1. Under *McDonnell-Douglas,* to prove a prima facie case of racial discrimination, plaintiff must show: "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S. at 802, 93 S.Ct. at 1824.