875 F.2d 867
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Joe L. ROBINSON, Plaintiff-Appellant,
v.
Dave QUICK and Zola Peck* (88-3298); Local 696,
U.A.W. (88-3655), Defendants-Appellees.
 Nos. 88-3298, 88-3655.
 United States Court of Appeals, Sixth Circuit.
 May 15, 1989.
 
 Before NATHANIEL R. JONES, WELLFORD and RALPH B. GUY, Jr., Circuit Judges.
 RALPH B. GUY, Circuit Judge.
 
 
 1
 In this consolidated appeal, plaintiff, Joe L. Robinson, appeals the district court's judgments in two separate actions stemming from events leading up to and including his termination from employment with the Delco Moraine Division of General Motors (GM) in Dayton, Ohio. Robinson represented himself pro se in all prior proceedings, and continues to do so on appeal. In his first action (I), Robinson sued his GM supervisors pursuant to 42 U.S.C. Sec. 1981 claiming that they discriminated against him in his job placement and discipline. The defendants prevailed in a jury trial and Robinson now challenges both the jury's verdict and its composition. In his second action (II), Robinson sued his union under a variety of theories for its conduct and representation of him in the events leading to his termination. Robinson now appeals the court's summary judgment ruling in favor of Local 696 of the U.A.W. (Union). After carefully reviewing plaintiff's contentions, we affirm the district court's judgments in both actions.
 
 I.
 
 2
 Joe L. Robinson is a black man who was employed by GM continuously from 1968 until 1985. During that time, he was a member of the Union. In 1974, Robinson sustained injuries to his neck, shoulder, and arm at work, which required two surgeries in 1983. Post-operatively, Robinson was medically restricted ("coded") from performing certain jobs at work. Specifically, Robinson could only perform light work and was restricted to a twenty-pound weight limit. He could not perform assembly line work, overhead reaching involving pulling or lifting above the shoulders, or truck driving. (App. I, 374). From May through June of 1984, Robinson was disciplined for refusing to perform job assignments that management classified as "light duty" but that Robinson claimed he was physically unable to perform. After one such incident of discipline by Zola Peck, Robinson's foreman, GM's plant medical director asked plaintiff's physician, Dr. Duarte, to visit the plant to evaluate Robinson's job and identify other appropriate positions for him. Dr. Duarte complied and, by letter dated May 1, 1984, identified three suitable positions for Robinson.[1] When Robinson subsequently refused to perform one of those positions, he was disciplined by another supervisor and filed a grievance, which was subsequently settled by the Union. After Robinson was again disciplined by defendant Peck, he filed another grievance and his first complaint in federal court.
 
 
 3
 By early 1985, plaintiff's general supervisor, Dave Quick, asked the plant medical department to assist him in identifying appropriate jobs that would comport with Robinson's codes. While the job search was underway, Robinson received passes to go home when there were no suitable productive jobs for him in the department. On an interim basis, he was assigned to an off-line position ("the banjo job"), but that position was being phased out. Even in that position, however, Robinson was disciplined by Quick for non-performance during work hours. When Robinson was confronted about his non-performance, he allegedly stated that he had made enough banjos for the day and refused to return to work. Robinson grieved the disciplinary action, but the Union ultimately withdrew the grievance.
 
 
 4
 In August 1985, when the banjo job no longer existed, a meeting was held involving seven members of the plant's management and medical personnel to identify an appropriate job for Robinson. Notably, neither Quick, Peck, nor any Union personnel attended. As reflected in the meeting minutes (App. I, 375, 377), several positions had previously been considered and rejected as violative of Robinson's codes. (App. I, 374). Of three jobs given more serious consideration at the meeting, one was rejected because certain aspects of it violated Robinson's codes and another was rejected because it was the job Robinson performed when he was originally coded off assembly line work. The third position, the "Put-up Piston" job, ultimately was selected for Robinson after it was agreed to modify the position to suit his codes. Although the position also existed on the first shift, Robinson purportedly lacked seniority to occupy the day position. Accordingly, it was agreed to transfer Robinson to the second shift. (App. I, 375, 377).[2]
 
 
 5
 When Robinson reported for work on the morning of August 5, 1985, he was advised of his transfer to the second shift and instructed to leave and return later.[3] Robinson protested that the transfer violated seniority provisions of the collective bargaining agreement between GM and the UAW and refused to leave even when he was given a direct order to do so. Consequently, he received a disciplinary layoff (DLO) by Quick for refusing to obey the order. (App. I, 366). On August 8, 1985, Kent Hawkeye, a Union committeeman, filed a grievance on Robinson's behalf seeking to overturn the DLO (App. I, 365). Robinson declined to follow other Union officials' advice to report to the new shift first and grieve the transfer later. Thereafter, Robinson filed no further grievances. Although he reported every morning for work, Robinson was denied entry for that shift by plant security. He never reported for work on his newly assigned second (afternoon) shift. A series of letters[4] ensued in which Milton Anderson, the plant's associate administrator, warned Robinson that failure to report to his proper shift could cause him to lose his seniority. Robinson claims to have sent the Union a copy of one of these letters but never asked the Union to grieve it. Rather, Robinson responded to Anderson by letter in which he concluded: "I am reporting to work on Wednesday, August 29, 1985 at 6:30 a.m. I will show your letter at the plant entrance, that is all I can do." Anderson subsequently sent another warning letter to Robinson advising him that his continued failure to report for the afternoon shift assignment would lead to his termination. Robinson failed to comply and continued to report on the day shift. On September 17, 1985, Robinson received a letter from Anderson advising him that his seniority was terminated due to his failure to report for work. Robinson did not grieve his termination.
 
 
 6
 Although Robinson contends that his August 8, 1985, grievance protested the DLO and the shift change as violative of the collective bargaining agreement, and that he relied on the Union committeeman's expertise as to how such things were done, the grievance only protested Robinson's August 5, 1985, DLO and sought that it be disaffirmed. (App. I, 365).[5] This grievance was ultimately withdrawn by the Union when it was determined to be without merit. The discipline was deemed appropriate in view of Robinson's failure to obey a direct order, which violated "Shop Rule # 12." Robinson did not appeal this disposition of his grievance.
 
 
 7
 Robinson's first complaint was filed against his supervisors, Zola Peck and Dave Quick, in June 1984 alleging that, unlike coded white employees, he was disciplined for his refusal to perform jobs contraindicated by his physical condition and physician's orders.[6] Although his initial complaint lacked factual allegations that the discipline was racially motivated, he was permitted to amend his complaint to particularize a cause of action under 42 U.S.C. Sec. 1981.[7]
 
 
 8
 A jury was selected on November 23, 1987, and, although Robinson questioned the members about their ability to render a fair decision, he raised no objections regarding the jury's racial composition until after the jury returned a verdict for defendants. The district court denied Robinson's subsequent motion for a new trial, finding that the verdict was not against the great weight of the evidence and that Robinson's failure to properly challenge the jury composition earlier precluded him from making such a challenge after the verdict had been rendered.
 
 
 9
 Robinson's action against the Union (II) was filed on September 26, 1986. It was brought initially pursuant to 42 U.S.C. Sec. 1983; 42 U.S.C. Sec. 1985(3); section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. Sec. 185; 42 U.S.C. Sec. 1981, section 704(a) of Title VII, 42 U.S.C. Sec. 2000e-3(a); and the fourteenth amendment of the United States Constitution. Following cross-motions for summary judgment, the district court granted the Union's motion as to all claims except Robinson's claims of retaliation under section 704(a) of Title VII, 42 U.S.C. Sec. 2000e(3)(a) and 42 U.S.C. Sec. 1981.[8]
 
 
 10
 Robinson's retaliation claim alleged that the Union discriminated against him because of his support of his co-worker's racial discrimination action against the Union. Robinson had previously filed his retaliation claim with the EEOC and received a "right to sue" letter.
 
 
 11
 After deposing Robinson to flush out the basis for his retaliation claim, the Union again filed for summary judgment, which was granted in June 1988. That judgment is also the subject of the present appeal.
 
 I.
 Robinson's Claim Against his Supervisors
 A. The Sufficiency of the Evidence
 
 12
 Robinson first challenges the jury verdict for defendants Peck and Quick as being against the manifest weight of the evidence and necessitating a new trial. We note that "the grant or denial of a new trial is purely within the discretion of the trial court and will not be reversed except upon a showing [of] abuse of discretion." Logan v. Dayton-Hudson Corp., 865 F.2d 789, 790 (6th Cir.1989) (citation omited). As for Robinson's challenge of the sufficiency of the evidence as a basis for obtaining a new trial, we note that:
 
 
 13
 A trial judge cannot substitute his own judgment for that of the jury except when the jury's verdict is against the clear weight of the evidence. A jury's verdict that could have reasonably been reached should be left undisturbed. Bruner v. Dunaway, 684 F.2d 422, 425 (6th Cir.1982); TCP Industries, Inc. v. Uniroyal, Inc., 661 F.2d 542, 546 (6th Cir.1981).
 
 
 14
 Williams v. Union Carbide Corp., 790 F.2d 552, 554 (6th Cir.), cert. denied, 479 U.S. 992 (1986).
 
 
 15
 In this case, after reviewing the evidence, the district court declined to grant Robinson's "Motion to Overthrow Bias Verdict[,] Motion for New Trial and Emergency Relief," or his "Amended Motion to Overthrow Bias Verdict of Jury." (App. I, 480, 484). Our review of the evidence persuades us that the district court did not abuse its discretion by denying Robinson's motions. Essentially, the jury was confronted with two conflicting interpretations of the facts underlying Robinson's claim and found the defendants' version more persuasive. For example, while Robinson elicited testimony from his co-worker that Quick called Robinson a "sorry, black, son of a bitch," Quick vehemently denied making such a statement. While Robinson contended that Gene Baker, a white medically coded employee with two weeks less seniority than Robinson was favored by being placed on an easy job that Robinson could have performed, Quick testified that Baker's job had been considered for Robinson but was rejected because it entailed trucking duties, which are contraindicated for Robinson. Robinson's perception of Baker's job duties was based on the observations of a co-worker who testified that he had seen Baker bring coffee to Quick and Peck but had never seen him do any physical work. Quick's contrary assessment of Baker's position was corroborated by various records and by medical and other management personnel.
 
 
 16
 Finally, the evidence shows that, notwithstanding Robinson's protests that his job placements violated his codes, the defendants and other management personnel conscientiously sought to accommodate his codes in his placement. Robinson relied on the April 6, 1984, letter signed by Dr. Duarte to obtain light duty work (App. II, 210), but declined to perform jobs that were subsequently personally identified as suitable for him by Dr. Duarte. (App. I, 237).
 
 
 17
 It is the province of the jury to weigh the type of competing factual evidence presented in this case. Because we, like the district court, are convinced that the jury's verdict could reasonably have been reached, we decline to disturb that verdict.
 
 B. The Jury Composition Claim
 
 18
 We also reject Robinson's contention that the all-white jury was motivated by racial bias and prejudice, and his contention, as construed by the district court, that he was somehow prejudiced by the racial composition of the jury.
 
 
 19
 Robinson has presented no evidence suggestive of racial bias on the part of any juror beyond the fact that a verdict was rendered against him. If Robinson's challenge is based on selection of the jury venire, it is untimely because of its failure to comply with 28 U.S.C. Sec. 1867(c). That section provides:
 
 
 20
 In civil cases, before the voir dire examination begins, or within seven days after the party discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, any party may move to stay the proceedings on the ground of substantial failure to comply with the provisions of this title in selecting the petit jury.
 
 
 21
 Moreover, section 1867(e) provides that the procedures described in section 1867(c) constitute the exclusive means by which a party in a civil case can challenge any jury on the ground that such jury was not selected in conformity with statutory provisions governing jury selection. It does not, however, preclude pursuit of other civil remedies available to vindicate or enforce laws against racial discrimination in jury selection. Robinson failed to challenge the jury selection procedures until after the verdict was rendered, rather than when he first became aware of the racial composition of the jury. Accordingly, the district court properly rejected his post-verdict statutory challenge as untimely.
 
 
 22
 Robinson's constitutional challenge to the racial composition of the jury, however, is not controlled by section 1867(c). Robinson claims that his equal protection rights were violated by the defendants' use of peremptory challenges to dismiss two black persons selected for the jury. There is no doubt about the authority to exercise peremptory challenges generally. 28 U.S.C. Sec. 1870. Some restrictions on the exercise of that authority, however, recently have evolved. For example, in Batson v. Kentucky, 476 U.S. 79 (1986), the Supreme Court established standards to determine whether a prosecutor's peremptory challenges reflect purposeful discrimination in selection of the petit jury in a criminal trial.
 
 
 23
 In that context, to establish a prima facie case of purposeful discrimination, a defendant must first demonstrate membership in a cognizable racial group and that other members of his race have been removed from the venire via peremptory challenges by the prosecutor. A defendant may rely on the indisputable fact that peremptory challenges constitute a method of jury selection that allows " 'those to discriminate who are of a mind to discriminate.' " Batson, 476 U.S. at 96 (quoting Avery v. Georgia, 345 U.S. 559, 562 (1953)). Finally, a defendant must show that the underlying facts and relevant circumstances indicate that the prosecutor employed this method "to exclude veniremen from the petit jury on account of their race." Batson, 476 U.S. at 96. The Court in Batson indicated that an inference of discrimination may be found in a pattern of strikes against black jurors in a specific venire or in questions and statements made during voir-dire proceedings, or during the exercise of peremptory challenges. The Batson Court expressed confidence in the trial court's ability to determine whether peremptory challenges mask purposeful discrimination and whether a defendant can establish a prima facie case of such discrimination.
 
 
 24
 If a defendant makes out a prima facie case, the burden shifts to the prosecutor to provide a neutral explanation for challenging black jurors, but that explanation "need not rise to the level justifying exercise of a challenge for cause." Id. at 97.
 
 
 25
 The applicability of the jury selection standards established in Batson to civil cases, however, remains an open question in our circuit[9] and a split question in other circuits. See, e.g., Fludd v. Dykes, 863 F.2d 822 (11th Cir.1989) (Batson applies in civil and criminal cases); Edmonson v. Leesville Concrete Co., 860 F.2d 1308 (5th Cir.1988) (reh'g granted en banc Jan. 23, 1989) (extending Batson analysis to civil cases); Wilson v. Cross, 845 F.2d 163 (8th Cir.1988) (leaving applicability of Batson to civil cases open by finding that if Batson analysis applies, no prima facie case of racial discrimination was established); Clark v. Bridgeport, 645 F.Supp. 890 (D.Conn.1986) (Batson jury selection standards extend to civil cases involving state action); Esposito v. Buonome, 642 F.Supp. 760 (D.Conn.1986) (Batson analysis is not controlling in civil case but if it was, plaintiff failed to make out a prima facie case of purposeful discrimination).
 
 
 26
 In this case, as in Wilson, 845 F.2d 163, we need not determine whether the Batson analysis extends to jury selection in civil cases because, even if it did, Robinson has failed to make out a prima facie case of purposeful discrimination. Applying the Batson analysis to this case for discussion purposes only, we note that Robinson, as a black man, is a member of a cognizable racial group. Although no transcript of the voir dire proceedings or record of the racial composition of the jury panel exists, apparently two black jurors were peremptorily removed, leaving intact an all white jury to weigh Robinson's claims. Thus, the defendants utilized peremptory challenges to remove black venire members. Additionally, Robinson may rely on the fact that peremptory challenges provide a vehicle for discrimination. Robinson fails, however, to make out a prima facie case of purposeful discrimination because he is unable to demonstrate that these facts and other relevant circumstances indicate that the defendants used their peremptory challenges to exclude blacks from the petit jury because of their race.
 
 
 27
 The jury venire contained approximately four black members, of whom two selected jurors were excused by defendants' peremptory challenges. Robinson never objected to the challenges before, during, or after the jury venire or voir dire. Rather, he asked the all white jury about their ability to render a fair verdict and, apparently satisfied with their response, proceeded to try the case. It was not until the verdict was rendered that Robinson objected to the jury composition. Surely, Robinson was aware of the composition of the jury and of the peremptory challenges that excused two of the four black persons in the venire. In his reply brief, Robinson states: "In voir dire of the jury, there was [sic] only four blacks, to [sic] went into the jury box, but was eleminated [sic] through challenge by the defendants. One was eleminated [sic] by the court because she worked with one of plaintiff [sic] witness [sic]. The other one was too far down the jury list to be placed in the jury box." (Plaintiff-Appellant's July 29, 1988, Reply Brief at 5). The fact that two black jurors were challenged by the defendants, one was excused for cause by the court, and one was not called to serve on the petit jury does not establish a " 'pattern' of strikes against black jurors included in the particular venire [giving] rise to an inference of discrimination." Batson, 476 U.S. at 97. Moreover, Robinson has not identified any questions or statements made by the defendants during voir dire that support an inference of discrimination. Finally, Robinson has not established any reviewable record or facts that might otherwise compel us to find that the circumstances surrounding the defendant's exercise of its peremptory challenges establish a prima facie case of discrimination against black jurors. It appears that the jury composition was acceptable to Robinson up until the point that the jury decided against him. An adverse verdict against a black plaintiff without more than what Robinson has presented to support his claim on this issue is insufficient. Robinson's sparse allegations concerning purposeful discrimination persuade us that even if the Batson analysis extends to jury selection in civil trials, Robinson failed to make out the requisite prima facie case. Accordingly, the district court's refusal to grant a new trial on this issue was proper.
 
 II.
 Robinson's Claims Against the Union
 
 28
 Robinson's claims against the Union were disposed of in two separate summary judgment rulings in favor of the Union (App. II at 183, 199). Our standard of review of a grant of summary judgment provides:
 
 
 29
 Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. "[T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)...." Anderson v. Liberty Lobby, Inc., ante, at 250.
 
 
 30
 Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (footnote omitted).
 
 
 31
 Confining our discussion to Robinson's challenge of the district court's grant of summary judgment for the Union on his claim of retaliation,[10] we first note that to make out a prima facie case of retaliatory discharge under Title VII, 42 U.S.C. Sec. 2000e(3)(a), Robinson must show:
 
 
 32
 (1) that he engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding;
 
 
 33
 (2) that he was subject to adverse employment action subsequent to or contemporaneous with his protected activity;
 
 
 34
 (3) there is a causal connection between the protected activity and the adverse employment action.
 
 
 35
 Jackson v. Pepsi Cola, 783 F.2d 50, 54 (6th Cir.), cert. denied, 483 U.S. 1006 (1986) (citation omitted). The causal link requirement is also an integral component of a retaliation claim under 42 U.S.C. Sec. 1981. Irvin v. Airco Carbide, 837 F.2d 724, 727 (6th Cir.1987). Although Robinson can establish the first two factors, he falls short on the third one. That is, the adverse employment action that occurred after Robinson supported a racial discrimination claim resulted from his own actions rather than those of the Union. It was Robinson's refusal to comply with his shift change, despite repeated warnings of the consequences, that led to his termination. There is no evidence in the record that the Union prevailed upon GM to transfer or ultimately terminate Robinson.
 
 
 36
 Robinson tries to establish the requisite causal connection by recounting heated discussions between Union representatives and himself. Specifically, Robinson points to a warning issued by Union representative Dorris Duff that Robinson's support of his colleague's discrimination claim would lead to his job loss. Although relations between the Union and Robinson may have become hostile, that hostility is not necessarily tantamount to an intent to retaliate. Moreover, it was management and not the Union that decided to transfer, discipline, and ultimately terminate him.
 
 
 37
 Finally, Robinson claims that the Union retaliated against him with respect to filing or processing his numerous grievances concerning overtime deprivations, discipline, and other management actions. The record is replete with grievances filed by Robinson, some of which were settled and some withdrawn. The Union has no obligation to pursue every grievance to arbitration and grievances without merit may be withdrawn. Vaca v. Sipes, 386 U.S. 171 (1967). Robinson never appealed the withdrawal of any of his grievances and there is no evidence that grievances were withdrawn for retaliatory purposes. As noted, Robinson's grievance of his August 1985 DLO was withdrawn as meritless because the discipline was warranted in view of Robinson's failure to comply with a direct management order. Contrary to Robinson's belief, he never grieved his transfer, or for that matter, his termination. In fact, Robinson indicated that he stayed away from the Union to preserve his mental health after filing the August 1985 grievance protesting his DLO. Thus, we are not persuaded that any Union conduct instigated Robinson's transfer or termination. Robinson has no basis to claim that the Union retaliated against him by failing to pursue nonexistent grievances.
 
 
 38
 Because Robinson has failed to demonstrate the requisite causal connection essential to a claim of retaliation, we conclude that summary judgment was properly granted to the Union on this issue.
 
 
 39
 The district court's judgments are AFFIRMED.
 
 
 
 *
 By letter dated March 28, 1989, this court was informed of Zola Peck's death following the trial of this case
 
 
 [1]
 These positions included the "outboard shoe job," the "inboard shoe job," and the "washer, plug, and bolt job." (App. I, 237)
 
 
 [2]
 The actual decision to transfer Robinson to the second shift was made by Jack Kinderdine, the then manufacturing superintendent of the GM plant in Dayton
 
 
 [3]
 Because Robinson was on vacation in Texas when the transfer decision was made, he was unable to be notified of the change by phone, as planned. Accordingly, he first learned of his transfer when he reported for work the day the transfer took effect
 
 
 [4]
 These letters are commonly known as "Section 64(d) letters" in correspondence with a collective bargaining agreement provision for loss of seniority for failure to report to work after written notice to report has been provided
 
 
 [5]
 The record copy of this grievance contains the following handwritten phrase at the top of the page: "Filed grievance shift change." It is unclear when or by whom this entry was made but it is not part of the grievance or disposition portions of the form
 
 
 [6]
 Initially, GM was not named as a defendant in this suit. The district court rejected Robinson's later attempt to amend his complaint to add GM as a party
 
 
 [7]
 Robinson was permitted to allege that his supervisor discriminated against him in such ways as giving preferential treatment to a white medically coded employee, Gene Baker. Robinson continued to file, without leave of the court, numerous amended complaints seeking, among other things, to expand the statutory basis for his claim to include a Title VII claim. The district court, in its discretion, allowed only those amendments that supplemented his 42 U.S.C. Sec. 1981 claim and ordered Robinson not to file further amendments without leave of the court
 
 
 [8]
 The district court dismissed Robinson's 42 U.S.C. Sec. 1983 and fourteenth amendment claims for want of any evidence of state action. Likewise, the lack of any proffered evidence of conspiracy prompted the court to dismiss his claims under 42 U.S.C. Sec. 1985(3)
 His LMRA claim was dismissed because it was barred by the six-month statute of limitation. See Del Costello v. International Bhd. of Teamsters, 462 U.S. 151, 157, 172 (1983). Robinson's failure to provide evidence of disparate treatment persuaded the court of the absence of any genuine issue of material fact concerning alleged racial discrimination. Thus, the Union was granted summary judgment on Robinson's racial discrimination claims brought under 42 U.S.C. Sec. 1981 and Title VII, 42 U.S.C. Sec. 2000e-3(a). We are in accord with the district court's disposition of these claims and decline to address them further.
 
 
 [9]
 In our unpublished opinion in Boykin v. Hamilton County Bd. of Educ., No. 87-4025 (6th Cir. Feb. 14, 1989), we noted that the trial judge accepted and the parties stipulated that Batson applied to their civil case. We declined to consider "whether as a general principle Batson applies to all civil cases."
 
 
 [10]
 For discussion of Robinson's other claims, see supra note 8