David F. DIAMOND, Plaintiff–
Appellant,

v.

UNITED STATES POSTAL SERVICE,
William J. Henderson; American
Postal Workers Union, and Cleveland
Area Local, American Postal Workers
Union Defendants–Appellees.

No. 00–3425.

United States Court of Appeals,
Sixth Circuit.

Jan. 4, 2002.

Before BOGGS and CLAY, Circuit Judges; and ROBERTS, District Judge.*

PER CURIAM.

David Diamond, a postal worker, has brought suit against the United States Postal Service ("USPS"). Postmaster Henderson, and the local and national branches of his union, the American Postal Workers Union ("APWU," distinguished as "the Local" and "the National"). Diamond alleges that USPS violated Title VII, 42 U.S.C. § 2000e et seq., and its Collective Bargaining Agreement ("CBA") with its workers. Diamond claims that USPS subjected him to a sexually and racially hostile environment and to retaliation for his complaints. Diamond's action against the APWU defendants is premised on a breach of their fair duty of representation, pursuant to 39 U.S.C. § 1208. The district court dismissed all of Diamond's claims

following defendants' motions for summary judgment, largely on grounds of failure to exhaust remedies. Diamond appeals, and we affirm.

I

Plaintiff is a black male truck driver, attached to the Motor Vehicle Unit (MVU) at a substation of the Cleveland Post Office. In December 1997, Diamond began to complain about how MVU drivers (who had always "horsed around" on the dispatch radio) were trading barbs and crude innuendos about another driver, Mr. Vincent Cook. In 1995, Cook turned in a driver for sleeping on the job, thereby becoming the target of hostility. Much of the drivers' on-air commentary was laced with suggestions that Cook was engaged in homosexual activities or that the drivers wished to engage him in such conduct. Cook was also referred in derisory terms as "Cookie-baby," and "bitch."[1] Similar comments occurred off the air when workers were in the substation.

When the offending drivers did not stop in response to his admonitions, Diamond spoke to his supervisors Records and Crockett (who apparently tolerated the conduct) in January 1998. Diamond claims that Crockett then attributed Diamond's concern to Diamond's own desire for homosexual sex. Diamond assert that he interpreted Crockett's alleged response, that maybe Diamond wanted someone to "slap grease up his ass," as an "unwelcome sexual advance[ ]."(Diamond Dep. at 467). Diamond presents no other evidence that he was a genuine target of Crockett's lustful intentions, although he has submitted the statements of coworkers substantiating that Crockett often "humorously" suggest-

---

* The Honorable Victoria A. Roberts, United States District Judge for Eastern District of Michigan, sitting by designation.

1. Mr. Cook is not a homosexual (and so far as the record discloses, neither is the plaintiff nor anyone else involved in this case).

ed to employees that he was going to engage in homosexual activities with them.

Also in January 1998, Vincent Cook departed from the MVU night shift (while still working in the Cleveland Post Office) and freed himself of the odious harassment. Nonetheless, Diamond sought out Cook in May 1998, *cf. Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (well-publicized precedent establishing a cause of action for same-sex harassment, issued March 4, 1998). He suggested Cook file an EEO complaint about the earlier harassment, in order to get "three hundred thousand dollars." (Cook Dep. at 126–28); *cf.* 42 U.S.C. § 1981a(b)(3) (limiting compensatory awards under Title VII to three hundred thousand dollars). According to Cook, Diamond stated that Cook could "slip me fifty thousand dollars" from any award. (Cook Dep. at 127). Despite repeated phone calls from appellant urging him to bring a formal complaint and collect money damages, Cook refused to do so.[2]

Meanwhile, Diamond began to complain about Crockett and Records. He spoke to fleet manager Pennington (a black female) in March or April 1998 and, in May 1998, to plant manager Calhoun (a black male). Also in May he told Local union steward Rochford he wanted to file "charges" against Crockett and Records. He later spoke to Local union steward McDaniels about bringing "charges." Neither Rochford nor McDaniels was willing to bring grievances on Diamond's behalf, although Diamond does not contest that he had a right under the CBA to file a grievance on

his own. Diamond's efforts culminated in a June 5, 1998 meeting at which plant manager Calhoun discussed safety issues regarding radio use and briefly mentioned allegations of racism in the MVU (these also had their origin with Diamond, who identified himself at the meeting as the one making such allegations). Diamond was informed that his allegations about what had been done to Cook were being turned over to an EEO officer for investigation (within a few months Crockett was fired and Records demoted as the result of this investigation).

Diamond claims that his fellow employees in MVU were displeased with his public-spirited efforts to improve his part of the Postal Service (especially displeased were those he had alleged were responsible for racial remarks), and that they began harassing him. He claims that Crockett and Records "played with his time card" and that other coworkers did things to his truck that would "set him up" for disciplinary action, including "planting" an empty express mail pouch in the truck to make it appear Diamond was stealing mail. Diamond suffered no disciplinary action. However, he did leave work on July 16, 1998, complaining of chest pains brought on by the anxiety of the hostile environment at the MVU. When he returned following treatment, fleet manager Pennington assigned him different duties because, as recorded in a memo, she was concerned to keep Diamond away from the "very hostile situation" that had developed between him and the other drivers.

---

**2.** Mr. Cook apparently saw little practical value in pursuing Diamond's proposal because "I'm away from those guys." Cook rejected Diamond's lure of litigation riches on the ground that "if you don't earn your money, you don't deserve it." Cook's use of this precept did not deter Diamond, however, who

continued to try to get Cook to file an EEO charge by suggesting supervisor Records "was a racist." However, since Cook "disagree[d] with that totally" he refused to file charges on that basis either. (Cook Dep. at 129).

Diamond was not happy with this resolution and filed an EEO complaint based essentially on the above facts on August 28, 1998; his initial contact with an EEO officer regarding his complaint was on August 14, 1998. Diamond also contacted the Local about filing a grievance to get his old position back. They did so, and were successful in reinstating Diamond just as he wished. Nonetheless, Diamond filed internal union charges against McDaniels and Rochford for failing to assist him in the Spring of 1998, and a hearing was held on this matter in October 1998. However, Diamond broke off the internal union process in a letter from his attorney in November 1998, and never pursued a union appeal to a hearing before the National.

The EEO's final agency decision in January 1999 dismissed most of Diamond's claims, noting that they had not been brought to the attention of the EEO within the 45–day limit applicable to federal employees, 29 C.F.R. 1614.105(a)(1), and that many involved conduct directed at another (Cook). The EEO was willing to review Diamond's job transfer (which by that time had been remedied). The present lawsuit, essentially appealing the EEO's decision, was filed in February 1999. As part of his Memorandum Opposing Defendant's Motion for Summary Judgment, Diamond attached parts of his September 1999 deposition, in which he reported several incidents he characterizes as "retaliation" which have occurred since his filing of his original EEO complaint. Diamond appears to have filed reports with the postal police for the more serious of these incidents. These alleged retaliatory acts have themselves becomes the subject of a *new* EEO charge filed in July 1999, whose disposition is apparently still pending. However, Diamond has not sought to amend his complaint in the present action to include these events, and the district court declined to exercise jurisdiction over them. The district court dismissed Diamond's claims in March 2000, prompting this appeal.

## II

### *Standard of Review*

On appeal, we review a grant of summary judgment de novo, using the same Rule 56(c) standard as the district court. *Hansard v. Barrett*, 980 F.2d 1059 (6th Cir.1992). The moving party has the initial burden of proving that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### *Diamond's Title VII ClaimsHostile Environment*

Diamond's Title VII claims are asserted against his employer USPS. As a federal employee, Diamond was required to bring his complaints of a sexually and racially hostile environment, and retaliatory conduct, to the attention of an EEO Counselor within forty-five days of the complained-of conduct. *See* 29 C.F.R. 1614.105(a)(1). Since Diamond initiated contact with EEO on August 14, 1998,[3] only conduct that occurred before that date and since the beginning of July 1998 would normally be considered to have been timely presented.

---

**3.** This coincided with the issuance of "Proposed Removals" by the Postal Service against Records on August 13, and against Crockett on August 14.

■ Diamond's August 1998 complaint is at issue here, and inspection of it shows only one incident related to either sexual or racial matters that arguably falls into this period. This incident involved a non-supervisory white coworker, fellow driver Norman Mack. Diamond claims that on the third shift, while they both were in the swing room, Mack said that "now he was going to have to shoot a coon in his barn" apparently with a desire to assist "the whole farm." (Diamond Dep. at 104). Diamond claims that he interpreted "coon" as a racial slur, and Mack's comments as an oblique threat. At the time of the deposition. Diamond claimed he thought this incident had occurred in May. However, in his EEO complaint, attested to under penalty of perjury, he asserted that it had occurred in "July." The EEO did not discuss this incident in the resolution of Diamond's August 1998 complaint. Although the district court did note the incident briefly, it apparently was relying on the plaintiff's deposition at that point and did not note the discrepancy in date.[4] (Dist. Ct. Op. at 4).

However, on summary judgment we must construe the facts favorably to the non-movant, here Diamond. The date of this incident may be reasonably construed as in July, and therefore timely. And, without knowing more of the context of the statement and its motive, we may reasonably adopt Diamond's interpretation, and consider the statement a racial slur.

A racially hostile work environment claim under Title VII requires discrimination that is so "severe or pervasive" as to alter the conditions of the victim's employment and create an abusive working environment. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir.1999) (quoting

*Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir.1999). The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile, and the victim must subjectively regard that environment as hostile. *See Jackson*, 191 F.3d at 658. In determining whether the environment is objectively hostile, courts must look at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hafford*, 183 F.3d at 512 (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

We may assume for purposes of summary judgment that the MVU environment was "hostile" toward Diamond (Pennington's memo admits as much) and that Diamond so perceived it. The question under Title VII, though, is the source of that hostility and whether the hostility changed a term or condition of Diamond's employment. But, as the Supreme Court has recently held, normally a single remark, where it represents an "isolated incident," is unable to produce so severe an effect. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 1510, 149 L.Ed.2d 509 (2001) (per curiam). Considering the totality of the circumstances, we hold that Diamond has failed to show a genuine issue of material fact as to whether the MVU at Cleveland Post Office was a racially hostile environment in the summer of 1998.

---

4. This is not surprising, considering that the plaintiff failed to assert the July date when describing the "coon" incident or arguing for

timeliness of the complaint. (Pl.'s Br. Opp. Summ. J. at 6, 13)

Diamond counters that he may present other earlier incidents under theories of either "continuing violations" or "equitable tolling." There are no current instances of sexual harassment, and therefore the continuing violation theory is unavailable for claims based on sex. *See Jackson,* 191 F.3d at 668 (discussing continuing violations doctrine).

With regard to equitable tolling, Diamond claims that his June contact with EEO officer Mize, who was looking into the sexually hostile environment surrounding Vincent Cook, should provide an exception to limitations on filing a claim. Because this basis only applies to claims based on sex, equitable tolling cannot be applied to Diamond's racially hostile environment claim. However, even if one applies equitable tolling to the *sexually* hostile environment claim, this cannot be saved. Equitable tolling would treat Diamond's first contact with the EEO as occurring on June 5, which moves the relevant time period back to April 21, 1998. This was well after Crockett's "advance," [5] and the mistreatment of Cook, even assuming the latter is relevant for Diamond's claim. In the absence of equitable tolling, or treatment of continuing violations, Mack's "shooting a coon in his barn" comment provides the only cognizable basis for

the hostile environment claim, and this is insufficient.

■ Even had Diamond shown a hostile environment, summary judgment for USPS would be appropriate, because a Title VII plaintiff must also "prove that [his or] her employer tolerated or condoned the situation or that the employer knew or should have known of the alleged conduct and failed to take prompt remedial action." *Jackson,* 191 F.3d at 659 (citations and internal quotation marks removed). Diamond has failed to present convincing evidence that the USPS condoned a racially hostile environment at the MVU.[6] Crockett and Records were both promptly investigated and disciplined by the postal authorities, although primarily on the basis that they tolerated the mistreatment of Cook.

■ As the district court recognized, Diamond's most substantial and plausible claims concern retaliation. For a retaliation claim, "a plaintiff must establish that: (1)[he] engaged in activity protected by Title VII; (2) the exercise of [his] civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff, *or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor;* and (4) there was a causal connection

5. On the merits, Diamond's best argument is based presumably on the alleged pass by Crockett (it was for just such hijinks that Crockett was fired). However, a single pass made by a supervisor, even accompanied by other harassment, has been held not to constitute a sexually hostile environment. *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 790 (6th Cir.2000). Apart from Crockett, Diamond's allegations of harassment of an even semi-sexual nature consist of comments directed to him such as "bite me." These, taken in themselves, would clearly be the type of "simple teasing" and "offhand comments" that "will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton,*

524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Although *Mr. Cook's* travails might under some circumstances constitute "discrimination because of ... sex." *Oncale,* 523 U.S. at 118, 118 S.Ct. 1003, it is difficult to see how the acts taken against Mr. Diamond were based on his sex rather than on the *personal* animus that developed against him due to his complaints.

6. We note that at least 40% of this unit of the USPS is black, (Pl.'s Br. Opp. Summ. J. at 2), as are many of the supervisory personnel overseeing it, including fleet manager Pennington and plant manager Calhoun.

between the protected activity and the adverse employment action or *harassment." See Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 792 (6th Cir.2000) (emphasis in original). Diamond has alleged that Records and Crockett, supervisors of the plaintiff, harassed him, and it is plausible, under a summary judgment standard, that any harassment that occurred was connected to Diamond's activities on behalf of himself and Cook. The main questions then would be whether Diamond has provided enough evidence for there to be genuine issues of material fact as to whether what he was doing was "activity protected by Title VII" and as to whether the retaliatory harassment was of sufficient severity and pervasiveness.

It seems that Diamond has established the first of these remaining requirements. In *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1312 (6th Cir.1989), we held that protection against retaliation "extends to persons who have participated in any manner in Title VII proceedings." As Diamond was the moving force behind an active EEO ·investigation and gave information to it, he appears to have "participated" sufficiently to have standing to bring a retaliation claim. However, Diamond has not made a sufficient showing regarding the pervasiveness and severity of the harassment. Despite Diamond's suppositions that Records and Crockett were attempting "to set him up," he never suffered any adverse consequences as a result. Diamond specifically refers only to an occasion during which Crockett and Records called him to the time clock in mid-July and "waved ·an AWOL slip, implicitly threatening to discipline him without cause for tardiness." (Diamond Br. at 18). Even if this can be construed as some sort of harassment, it was neither made sufficiently pervasive through repetition, nor was it sufficiently severe to alter the conditions of Diamond's employment.[7] *Cf. Morris,* 201 F.3d at 793 (finding sufficient evidence of retaliation when supervisor called plaintiff thirty times to harass her, followed her home, and threw roofing nails on her driveway).

*USPS Breach of the CBA.*

As a separate claim, and in hopes of avoiding the bar against untimeliness discussed above, Diamond alleges that the hostile environment at USPS violated a prohibition against "discrimination … because of race … [or] sex," which is embodied in the CBA. Diamond, however, is

---

7. In August 1998, Diamond also alleged acts by "anonymous individuals," primarily minor acts of sabotage to his truck. During the course of this appeal, and in his July 1999 complaint to the EEO, he presented far more specific and serious allegations regarding his co-workers, identifying drivers who have attempted to run him off the road or play involuntary games of "chicken" with his truck. (Diamond Br. at 19). Obviously, these alarming events, if genuine, would present a very different case. The Sixth Circuit has not definitively ruled on whether co-worker retaliation is actionable under Title VII if an employer has notice of it but fails to correct it, and we have no need to do so at this time. *But see Patton v. Sears, Roebuck & Co.,* Nos. 97–2310, 98–1621, 98–1004, 2000 WL 1681017 at \*5 n. 1 (6th Cir. Nov. 1, 2000) (unpublished) (sustaining jury verdict arguably based on this premise). We may not address these incidents, because Diamond has failed to show that he has exhausted his EEO remedy as to them. *See Haithcock v. Frank,* 958 F.2d 671, 675 (6th Cir.1992) ("A person who claims to have been discriminated against in violation of Title VII may not seek relief in federal court unless administrative remedies have first been exhausted."). To the extent that he is currently attempting to assert them, they are therefore dismissed without prejudice. We can only assume that the various investigatory and law enforcement arms of the USPS are addressing these matters, which appear to threaten not only Diamond personally, but also postal property and the efficient operation of the mails.

equally bound by the terms of this agreement. "Since the employee's claim is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced," and therefore "must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement." *Vaca v. Sipes,* 386 U.S. 171, 184, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). With regard to a 39 U.S.C. § 1208(b) claim, the Sixth Circuit has held that "it is axiomatic that an aggrieved employee must exhaust any exclusive grievance and arbitration procedure created in a collective bargaining agreement prior to bringing a ... suit against the employer." *Kaiser v. United States Postal Serv.,* 908 F.2d 47, 49 (6th Cir.1990) (citation and internal quotation marks omitted).

Diamond makes a general assertion that he is excepted from exhaustion, because pursuing the grievance procedure would have been futile. However we require "a clear and positive showing of futility before excusing a failure to exhaust." *Terwilliger v. Greyhound Lines,* 882 F.2d 1033, 1039 (6th Cir.1989), *cert. denied,* 495 U.S. 946, 110 S.Ct. 2204, 109 L.Ed.2d 531 (1990) (citation and internal quotation marks omitted). Diamond does not deny that he did not require participation of the union to initiate the grievance process.

Diamond's claim of futility is difficult to evaluate because he did not even properly initiate the process of arbitrating his hostile environment claims. Under *Terwiliger,* however, this negative and conclusory evidence is insufficient to avoid dismissal. Diamond makes no complaints about defendant USPS that would indicate it did not respect the procedure provided in the CBA. Diamond has repeatedly declared "it was almost impossible to have a grievance filed, period." (Diamond Br. at 47). Yet this is belied by Diamond's experience with both the Local and USPS when he got his driving job back through use of the grievance procedure. We hold that plaintiff has not shown the CBA procedure was futile, so he may not invoke any exception to the exhaustion requirement. His contractual claim must, therefore, fail.

### Breach of the Duty of Fair Representation

Diamond claims both the National and Local branches of his union breached their statutory duty of fair representation toward him. A breach of the duty of fair representation occurs only when "a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca,* 386 U.S. at 190, 87 S.Ct. 903. To establish a breach of the duty of fair representation, Diamond must show that the union treated his grievance in a " 'perfunctory' manner, with caprice or without rational explanation." *Poole v. Budd Co.,* 706 F.2d 181, 183 (6th Cir.1983); *see also Owen v. Goodyear Tire & Rubber Co.,* No. 85–1–1282, 138 L.R.R.M. (BNA) 2153, 1991 WL 315137 at *4 (W.D.Tenn. 1991) (finding no breach of duty of fair representation where union acted in a reasonable manner in refusing to file plaintiff's grievance). A plaintiff must show more than mere negligence or mistaken judgment to establish such a breach. *Poole,* 706 F.2d at 183.

Diamond has not shown sufficient evidence for a rational trier of fact to find that the Local has breached the duty of fair representation. When he approached Rochford and McDaniels, even assuming that his desire for "charges" made clear what he wanted from them, they gave him a reasoned explanation regarding their concerns about a conflict of interest based on Diamond's apparent desire to grieve

the behavior of fellow union members. Moreover, the conduct of the Local as a whole indicates it was not attempting to act adversely to Diamond's interests; it pursued successfully his grievance to restore his position and undertook a hearing-based review of McDaniels's and Rochford's conduct.

Diamond's claim against the National is so weak as to border on frivolous. Because Diamond abandoned all appeals before getting to the level of the National, his only contact with this defendant appears to relate to a packet of materials he sent to them in July 1998.[8] This packet, reproduced in the record, consists largely of some cryptic notes in Diamond's hand from the June 5 meeting, a series of handwritten testimonials to Diamond, complaints about Crockett and Records, and some information sheets on sexual harassment. There are no materials in the packet to substantiate Diamond's assertion that the National "knew of the Local Union's failure to file a grievance." (Diamond Br. at 49). Indeed, Diamond gave the National no explanation of the materials at all, nor did he request any action from the National. It is still unclear what Diamond thinks the National should have done, even had it been able to decipher Diamond's intent, given that Diamond had never even attempted to get a grievance through the internal processes of the Local. Diamond's only suggestion is that the National could have referred him "back to the Local Union for assistance." (Diamond Br. at 49). Its failure to do so hardly constitutes bad faith in these circumstances.

## III

For the foregoing reasons, we AFFIRM the decision of the district court dismissing all defendants, without prejudice to pending administrative proceedings.

CLAY, Circuit Judge, concurring in part and dissenting in part.

CLAY, Circuit Judge.

Because I disagree with the majority's contention that Plaintiff failed to present evidence of sufficient severity and pervasiveness to sustain a claim of retaliation, I respectfully dissent on this issue.

In his August 14, 1998 EEO complaint, Plaintiff alleged, *inter alia,* that he was subjected to a variety of retaliatory conduct by his co-workers and supervisors in the forty-five days immediately preceding the filing of his EEO complaint. Plaintiff alleged that he was threatened by his co-worker Turner Nash, who told Plaintiff he "better watch himself." (J.A. at 528.) The EEO complaint also details a comment by Driver Norman Mack that could be perceived as a threat; Mack allegedly commented in Plaintiff's presence that he might have to shoot "a coon" in his barn. Plaintiff was also threatened with unwarranted disciplinary action by supervisors Records and Crockett. Plaintiff's EEO complaint allegations further detail repeated incidents where anonymous individuals would remove blocks from behind the wheels of Plaintiff's delivery truck and place empty express mail pouches in Plaintiff's vehicle to make appear as though Plaintiff had been stealing mail. In the middle of July, when Plaintiff reported to supervisor Records that the back of his delivery truck would not close (of course if the back of the mail delivery truck does not close, there is the potential that mail may fall out of the truck), Records nevertheless demanded that Plaintiff drive the fully loaded mail truck to the garage.

---

8. Diamond also claims to have spoken to a "secretary" at the National, (Diamond Br. at 21), although the specifics of what he communicated are not recounted.

When Plaintiff refused, fearing that he would be held responsible for any mail that might be lost, Records assigned Plaintiff a different vehicle with damage that had not been documented in the accident book, as would normally be the case. Only after Plaintiff insisted that the damage to the vehicle be recorded before he left the premises did post office personnel record the damage.

These incidents are sufficient to create a genuine issue of fact as to whether Plaintiff was the target of retaliation.[1] Accordingly, I would reverse the district court's order granting summary judgment to Defendant on Plaintiff's retaliation claim.

---

1. Although this Court has not taken a position on whether an employer can be held liable for co-workers' retaliatory harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 791 n. 8 (6th Cir.2000), other circuits have held that an employer may be held liable for co-workers' retaliatory harassment. *See, e.g., Fielder v. UAL Corp.*, 218 F.3d 973 (9th Cir. 2000); *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426 (2d Cir.1999); *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253 (10th Cir.1998).