Kristy L. SWANSON, Plaintiff,

v.

LIVINGSTON COUNTY, Donald Homan, individually and in his capacity as "Sheriff" for Livingston County, and Robert Bezotte, individually and in his capacity as "Undersheriff" for Livingston County, Jointly and Severally, Defendants.

No. 02–70980.

United States District Court,
E.D. Michigan,
Southern Division.

May 29, 2003.

Jamil Akhtar, Akhter & Sucher, Troy, MI, for Plaintiff.

John R. McGlinchey, Cohl, Stoker, Lansing, MI, Gregory L. Ulrich, Cummings, McClorey, Livonia, MI, for Defendants.

### OPINION AND ORDER

O'MEARA, District Judge.

This controversy concerns alleged co-worker sexual harassment (hostile work environment), retaliation, and retaliatory harassment of Plaintiff Kristy Swanson during her employment as a corrections officer/deputy with Livingston County. There also is a claim under 42 U.S.C. § 1983 for an unconstitutional policy or custom of the County. Plaintiff began employment with the County in November 1998 and resigned in January 2003. While there is no claim for constructive discharge *per se*, Plaintiff claims that retaliatory harassment by co-workers forced her to quit her job. Defendants[1] have filed a

---

1. The Defendants are Livingston County and Sheriff Donald Homan for all counts. Robert Bezotte, the Undersheriff of Livingston County, is also a Defendant with respect to the

Section 1983 claim. Former jail administrator, Nancy Riley, used to be a Defendant; she

summary judgment motion arguing that (1) the isolated incidents involving rumors and inappropriate comments by co-workers did not constitute a hostile work environment; (2) even if they did, the County took prompt, remedial action by undergoing an investigation and issuing appropriate discipline; (3) there is no evidence of retaliation and (4) there is no evidence of a custom or policy of the County that condones sexual harassment or retaliation.

Plaintiff argues that she was initially subjected to a hostile work environment from sometime in November 2000 to July 2001. (This is her Title VII claim for sex discrimination, Count I.) These allegations mainly involve co-workers spreading rumors that she was promiscuous; inappropriate questions and comments; and an infatuated co-worker sending romantic e-mails. There were no threats or physical contact. In May 2001, the County undertook an investigation; issued a report on July 31, 2001; and meted out discipline to various co-workers in August 2001. Plaintiff claims that, after the investigation, she was subjected to retaliatory harassment by co-workers. (This is her Title VII retaliation claim, Count IV.) In December 2001, she filed a charge with the EEOC. In January 2002, she received a one-day suspension without pay for violating a jail security regulation. She claims that the one-day suspension was in retaliation for filing an EEOC charge. (This appears to be Count II for retaliation). She also has a claim under Section 1983 for an unconsti-

tutional policy or custom of the County. (Count III.)

The Court held a hearing in this matter on May 23, 2003. Having reviewed and considered the parties' motions, briefs and supporting documents, and having further considered the oral arguments of counsel, the Court is now prepared to rule on this matter. For the following reasons, Defendants' summary judgment motion is granted.

### BACKGROUND FACTS

Plaintiff began working in Livingston County as a corrections officer/deputy in November 1998. She admits that between July 2000 and December 2000 she regularly "socialized"[2] with road patrol deputy, Thomas Ash. (He was a co-worker and not a supervisor.) Apparently, Mr. Ash became infatuated with Plaintiff and sent her romantic e-mails and verbally expressed his love. In late 2000, Plaintiff began hearing rumors from other deputies that Ash was telling other people that they were romantically involved.[3] Officers McGinty and Warford testified in their depositions that Ash never said that they (Plaintiff and Ash) were having sexual relations—just that they were dating. Plaintiff claims that she told Ash to stop spreading rumors.

During this same period in late 2000, Deputy Cheryl Miks began spreading rumors about Plaintiff. Plaintiff and Miks had lived together for a short period of time from November 1999 to February

was dismissed from this litigation in January 2003.

**2.** She uses the word "socialized" in her brief. In her First Amended Complaint, she refers to Mr. Ash as a "former boyfriend." In her deposition, she admits that she "dated" him. Nonetheless, the extent of their relationship is in dispute. While he claims it was sexual, she claims that it was not.

**3.** It should be emphasized that Plaintiff admitted in her deposition that she and Ash "dated." Therefore, besides mere speculation on the part of Plaintiff, there is no evidence that the "rumors" she heard about herself and Ash were even untrue.

2000. Miks began telling co-workers that, while living together, Plaintiff would constantly bring men over, that her front door was a "revolving door", and that she (Miks) could not sleep at night because the bed springs in Plaintiff's bedroom were making so much noise. (In other words, that Plaintiff was promiscuous.)

In the Fall of 2000, Nancy Riley, the jail administrator, stated that Plaintiff informed her about some comments/rumors which were troubling her. Plaintiff also claims that she told her direct supervisor, Sergeant Vicky York, about the rumors. In her brief (p. 4), Plaintiff claims the harassment included: (1) comments by Deputy Miks; (2) rumors being spread by Ash; (3) rumors being spread by Officers McGinty and Warford about her relationship with Ash; (4) a comment by Deputy Milton that Plaintiff was a "psycho"; and (5) Kay Spence telling Officer Daniels that Plaintiff was "in rehab drying out" while in Arizona. (The latter two comments are not even related to Plaintiff's "sex.")[4]

In the beginning of 2001, Riley and York informed Lieutenant Karen Nowacki that Plaintiff had vaguely complained of sexual harassment and rumors. In March 2001, Nowacki met with Plaintiff to discuss the situation, but Plaintiff did not want to talk about the rumors at that time.[5] In May 2001, they discussed the situation in more detail.[6] Undersheriff Robert Bezotte ordered Nowacki to undertake an internal investigation about the rumors. Nowacki interviewed Miks, Ash and the other alleged rumor-spreaders and issued a formal report on July 31, 2001.

Punishment was meted out to certain individuals. (*See* Exhibit 7 to Plaintiff's brief, Counseling memos and Reprimands.) Officers David Klein, Jason Baker, Todd Farnsworth, and Larry Abraham received counseling memos for either contributing to the rumor-spreading and gossip or asking personal, inappropriate questions to Plaintiff about her sex life. Officer Keith Hutchins received a written reprimand for telling Plaintiff on three occasions that she had a "nice ass." Officer Miks also received a written reprimand for spreading

---

**4.** Another example of alleged harassment that is mentioned on page 13 of Plaintiff's brief (and not with the other examples on page 4) concerns her application in the Spring of 2001 to be transferred to the road patrol position. She claims that she heard from co-workers that she would sleep her way to the road patrol job. Plaintiff withdrew her application without informing anyone why. Officer Davis, who was also applying for the same job, sent Plaintiff an e-mail which Plaintiff claims insinuates that she would have slept her way to the job. While the e-mail is offensive, it is not clear that Davis is implying that she would sleep her way to the job. After the internal investigation, Lieutenant Karen Nowacki concluded that it was unclear what Davis' intent was because the e-mail was ambiguous. In any event, he was given a verbal warning. In addition, it appears that Plaintiff applied for the same position in the Fall of 2001 but again withdrew her application without telling anyone her reasons.

**5.** In her brief, Plaintiff claims that she discussed the rumors and Ash's "harassment" of her with Nowacki in March 2001 and asked Nowacki to inform Ash to leave her alone. Yet, the deposition transcripts from Nowacki and Plaintiff indicate that the meeting where sexual harassment was first discussed occurred in May 2001. Apparently, Plaintiff was not comfortable discussing the rumors and alleged harassment in March 2001 because Nancy Riley was present.

**6.** Specifically, Nowacki met with Plaintiff on May 9, 2001 and May 20, 2001 to discuss the rumors. Nowacki re-interviewed Plaintiff on June 1, 2001 to obtain more details. After Ash insisted that he and Plaintiff had previously had a relationship and that Plaintiff was lying to Nowacki, Nowacki re-interviewed Plaintiff again on June 25, 2001. At this meeting, Plaintiff admitted that she and Ash had "broken up" because he had been intimate with someone else. Plaintiff denied spending the night with him at his residence.

rumors that Plaintiff was promiscuous (i.e the revolving door comment). Deputy Ash did not receive any discipline for his treatment of Plaintiff because Nowacki could not determine that he was being untruthful. Yet, he was counseled to stay away from Plaintiff and cease all contact with her. According to Nowacki, Plaintiff had requested that Ash not be disciplined but just warned to stay away from her. Furthermore, in August 2001, Plaintiff advised Nowacki in writing that she did not want anything further done regarding the internal investigation. (*See* Exhibit 25 to Defendants' brief.)

Plaintiff stated in her deposition that she was satisfied with the level of discipline that everyone received, except for Miks and Ash. Although she had told Nowacki that she wanted no further action taken at the time, she stated in her deposition that Ash should have been punished and even fired for his behavior, especially because he continued to contact her after he was counseled not to. Plaintiff also emphasizes that Ms. Riley, the jail administrator, stated in her deposition that—based on her experience—the investigation conducted by Nowacki was neither fair nor objective and that the discipline meted-out was inadequate.

On August 9, 2001, Sheriff Homan posted a memorandum to all members of the Department advising them that he had just concluded a sexual harassment investigation and that he would not tolerate any forms of sexual harassment or retaliation. (*See* Exhibit 8 to Plaintiff's brief.) Nonetheless, Plaintiff claims that, once the members of the Department realized that they could sexually harass her with only minimal consequences, her life became intolerable. She cites 18 examples of so-called co-worker harassment which oc-

curred after the internal investigation ended. Many are too trivial to discuss. The more substantial allegations are discussed here.

Plaintiff claims that—after the investigation—Deputy Ash immediately started sending her e-mails professing his love for her. (*See* August 31, 2001 email at Exhibit 9 to Plaintiff's brief.) He also left a message on her cell phone at 2 a.m. that he was madly in love with her and wanted to get back together. While the e-mail and phone message were non-threatening, he had been ordered not to contact Plaintiff anymore. Nowacki conducted a second internal investigation of the matter and called Ash to discuss the situation. She warned him again not to contact Plaintiff, but no other action was taken.[7] (Ash had said that Plaintiff had requested that he call her.)

On December 14, 2001, a female inmate had to be restrained, and Officer Kirk Daniels and Plaintiff were investigated for their role in subduing the inmate. After an investigation, Officer Daniels was ultimately fired and Plaintiff received a one-day suspension. Plaintiff argues that the team that investigated the matter found that she had not violated any departmental rules or regulations. Thus, she claims that the one-day suspension (which she received on January 2, 2002) was in retaliation for her filing an EEOC charge (which she filed on December 17, 2001). As Defendants explain in their reply, the team that investigated the matter found that Plaintiff was not guilty of excessive force and assault and battery. (*See* Exhibit 16 to Plaintiff's brief.) Yet, Undersheriff Bezotte gave Plaintiff a one-day suspension without pay for entering the cell/housing area without her handcuffs or radio. He

---

7. Ash did receive a counseling memo in October 2001 for giving Plaintiff a handgun without her obtaining a purchase permit. Besides Nowacki's verbal warnings to have no further contact with Plaintiff, he received no other discipline for his alleged "harassment."

also noted that she had previously received a counseling memo for failing to follow the security regulations concerning the jail. In other words, according to Defendants, the one-day suspension was due to Plaintiff's violations of the security regulations—not because of her alleged use of excessive force, of which she had been exonerated.

Many of the other examples concern Plaintiff's subjective perceptions that people were staring at her and shunning her. In fact, it appears that Plaintiff has taken every single unpleasant experience that has occurred after the July/August 2001 internal investigation and attributed it to retaliatory harassment. For example, she says that in September 12, 2002 (one-year after the internal investigation), a Sergeant stated "I just wanted to congratulate you for not fucking up last night" after Plaintiff had to work an extra shift. Another example is her perception that, at a cultural diversity class in December 2002, the speaker was directly addressing his comments about sexual harassment to her. Yet, the speaker, Chief Jones, had never even met Plaintiff before the seminar.

In January 2003, Plaintiff says that she was forced to resign her employment because of all the retaliatory harassment.

### STANDARD OF REVIEW

The usual summary judgment standard applies: a motion under Fed.R.Civ.P. 56 may be granted if the pleadings and all supporting documentation show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). However, the moving party need not produce evidence showing the absence of a genuine issue of material fact.

Rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must view all the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See Bender v. Southland Corp.,* 749 F.2d 1205, 1210–11 (6th Cir. 1984).

Once the moving party discharges its burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. *See* Fed. R.Civ.P. 56(e); *Talley,* 61 F.3d at 1245. To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact. *See Lucas v. Leaseway Multi Transp. Serv., Inc.,* 738 F.Supp. 214, 217 (E.D.Mich.1990).

### LAW AND ANALYSIS

#### I.. Claim One: Title VII Hostile Work Environment

Courts have recognized two types of workplace sexual harassment as constituting discrimination on the basis of sex under Title VII: *quid pro quo* harassment, in which a supervisor requests sexual favors in exchange for job benefits, and "hostile work environment" harassment, in which a pervasive atmosphere of sexual harassment creates an objectively hostile work environment. *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 618–19 (6th Cir. 1986). Plaintiff's claim is the latter: that she was subjected to an objectively hostile work environment.

■ To prevail on her claim against Defendants, Plaintiff must show that (1) she is a member of a protected class; (2) she was subject to unwelcomed sexual harassment; (3) the harassment was based on her sex; (4) the harassment unreasonably interfered with her work performance and created a hostile work environment; and (5) the employer knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action. *Blankenship v. Parke Care Centers* 123 F.3d 868, 872 (6th Cir.1997) (citation omitted). Here, Defendants contest whether Plaintiff has established prongs four and five of the aforementioned test.

With respect to prong four, for alleged harassment to be actionable, it must be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (citation omitted). In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court explained that the conduct in question must be judged by both an objective and a subjective standard. The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive. *Id.* at 21–22, 114 S.Ct. 367. Acknowledging that this approach is not susceptible to a "mathematically precise test," *id.* at 22, 114 S.Ct. 367, the Court then sought to provide some guidance with regard to the somewhat elusive question of whether a work environment was objectively hostile or abusive. The Court explained that all of the circumstances should be considered, and it suggested a nonexhaustive list of relevant factors: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance. *Id.* at 23., 114 S.Ct. 367

■ Importantly, courts have held that sexually suggestive comments and vulgar remarks are generally not enough to create an objectively hostile work environment. *See Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir.1997)("Although the verbal comments were offensive and inappropriate, and the record suggests that defendant's employees did not always conduct themselves in a professional manner, Title VII was 'not designed to purge the workplace of vulgarity'") (citation omitted); *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir.2000)("Likins's behavior seems to have consisted of the kind of simple teasing, offhand comments, and isolated incidents that *Faragher* made clear did not amount to discriminatory changes in the terms and conditions of a plaintiff's employment."). Here, Plaintiff claims that she heard rumors from co-workers about her being promiscuous and other offensive remarks (such as her being a "psycho" and her being "in rehab drying out"). Significantly, there were no threats or physical touching, and the comments (some of which were not even sexual) [8] were not even directed at her *per se*—they were in the form of hearsay/gossip.[9] She admittedly

---

**8.** *See Morris* 201 F.3d at 792 (noting that conduct motivated out of "personal displeasure" is not the same as "discriminatory animus."). Just because certain co-workers may not have liked Plaintiff does not mean that they were discriminating against her based on sex.

**9.** Defendants suggest that hearsay/gossip cannot create a hostile working environment. The Court is not prepared to go that far. As

had some sort of relationship with Deputy Ash, although she claims it was not sexual. Considering she referred to him as her "former boyfriend" in her First Amended Complaint and admitted in her deposition that she "dated him," it calls into question how hearing rumors that she was dating him could be so objectively unreasonable as to create an abusive working environment. After viewing the totality of the circumstances here, we find that, even when construed in a light most favorable to Plaintiff, the conduct does not appear to have been more than "merely offensive." Again, there was no physical touching or threatening comments.

█ Moreover, the County took prompt remedial action to quell the rumors and counseled Ash to have no further contact with Plaintiff. Hostile work environment cases distinguish between harassment by supervisors and harassment by co-workers. The Sixth Circuit in *Blankenship* noted:

> [W]hen an employer responds to charges of *co-worker* sexual harassment, the employer can be liable only if its response manifests **indifference or unreasonableness** in light of the facts the employer knew or should have known. The act of discrimination by the employer in such a case is not the harassment, but rather the inappropriate response to the charges of harassment.
>
> \*      \*      \*      \*      \*      \*
>
> Once an employer is aware of and responds to charges of sexual harassment, though, mere negligence as to the content of the response cannot be enough to make the employer liable. *When an employer responds with good-faith remedial action, we cannot say that the*

*employer has itself committed an act of discrimination.* In sum, although negligence as to the existence of harassment may be enough, under *Rabidue,* for an employer to incur liability for discrimination, negligence in the fashioning of a remedy is not. *When an employer implements a remedy, it can be liable for sex discrimination in violation of Title VII only if that remedy exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination.*

123 F.3d at 873 (emphasis added). Significantly, the court further noted that "a harassment victim may not dictate an employer's action against a co-worker." *Id.* at 874.

Here, Nowacki—at the direction of Sheriff Bezotte—undertook an internal investigation and interviewed all participants about the alleged rumors. In July 31, 2001, a report was issued about the gossip and other inappropriate comments. Discipline was meted out to five employees for their role in spreading gossip or making inappropriate comments. Furthermore, in August 2001, Sheriff Homan posted a memorandum to all members of the Department advising them that he had just concluded a sexual harassment investigation and that he would not tolerate any forms of sexual harassment or retaliation.

It appears that Plaintiff takes most issue with the County's refusal to discipline Deputy Ash, who Plaintiff claims was the main instigator of the rumors. Yet, Ash was interviewed several times by Nowacki and she could not determine that he was being untruthful. While he had sent numerous romantic e-mails (presumably dur-

---

noted in *Spain v. Gallegos,* 26 F.3d 439 (3d Cir.1994), and *Jew v. University of Iowa,* 749 F.Supp. 946 (S.D.Iowa 1990), in unusual circumstances, a failure to quell rumors may be a factor to be considered in determining

whether a hostile work environment exists. Here, however, as explained in the text above, the employer took prompt, remedial action to quell the rumors.

ing his "relationship" with Plaintiff), they were not offensive (although, apparently, unwanted). In any event, she counseled him not to speak to Plaintiff anymore. While, in August 2001, he did send Plaintiff another romantic e-mail and call her at 2 a.m. on her cell phone after he had been counseled not to speak with her anymore, when these incidents were brought to Nowacki's attention, she undertook a second internal investigation. After interviewing Ash who claimed that Plaintiff requested that he call her, she gave him a verbal warning to stay away from Plaintiff. It does not appear that after August 2001 he bothered Plaintiff anymore. Furthermore, at the time, Plaintiff requested that Ash be warned to leave her alone and did not want any further discipline. In August 2001, Plaintiff even asked Nowacki to stop the investigation and requested that she not be contacted anymore about it.

Hence, even assuming that the rumors and unwanted e-mails constituted a hostile working environment by her co-workers, it cannot be said that the County acted unreasonably or indifferently. It took good-faith remedial measures by issuing written reprimands and counseling memos and undertaking an investigation. Although Plaintiff now claims that she was not satisfied with the level of discipline (especially with respect to Ash), she appeared satisfied at the time. Furthermore, although jail administrator Ms. Riley stated in her deposition that she thought the punishment was too minor, her opinion does not preclude summary judgment for the County here. As recognized in *Blankenship,* a plaintiff (or another employee like Ms. Riley) cannot dictate the level of discipline. In sum, we do not think a reasonable jury could conclude that the County acted unreasonably or with indifference. We therefore dismiss Count I for sexual harassment under Title VII.

## II. *Claim Two: Title VII Retaliation*

As clarified by Plaintiff in her response, here Plaintiff argues that her one-day suspension without pay on January 2, 2002 was in retaliation for her filing a charge of discrimination with the EEOC on December 17, 2001. On December 14, 2001, a female inmate had to be restrained, and Officer Kirk Daniels and Plaintiff were investigated for their role in subduing the inmate. After an investigation, Officer Daniels was ultimately fired (for use of excessive force) and Plaintiff received a one-day suspension. Plaintiff argues that the team that investigated the matter found that she had not violated any departmental rules or regulations. Therefore, she claims that the one-day suspension was in retaliation for filing a charge with the EEOC. Yet, as emphasized by Defendants, the team that investigated the matter found that Plaintiff was not guilty of excessive force and assault and battery. Undersheriff Bezotte gave Plaintiff a one-day suspension without pay, however, for entering the cell/housing area without her handcuffs or radio. He also noted that she had previously received a counseling memo in the past for failing to follow the security regulations concerning the jail. In other words, according to Defendants, the one-day suspension was due to Plaintiff's violations of the security regulations—not because of her alleged use of excessive force, of which she had been exonerated.

In order to establish a *prima facie* case of retaliation, plaintiff must establish the following elements: (1) that she engaged in protected activity; (2) that defendant knew of this exercise of her protected rights; (3) that defendant consequently took an employment action adverse to plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. *E.E.O.C. v. Avery Dennison Corp.,* 104 F.3d 858, 860 (6th Cir.1997). Once an

employee has set forth her *prima facie* case, the employer may establish a legitimate, non-discriminatory reason for any adverse action, and the plaintiff must show that this reason was a pretext for discrimination. *Jackson v. Pepsi–Cola*, 783 F.2d 50, 54 (6th Cir.1986).

■ While we question whether a one-day suspension without pay should be an "adverse employment" action in this context, the Sixth Circuit has held that suspensions without pay are adverse employment actions (while suspensions with pay are not). *See e.g., Gribcheck v. Runyon*, 245 F.3d 547, 551 (6th Cir.2001) (holding that a plaintiff suffered an adverse employment action when he was suspended without pay for fourteen days); *Jackson v. City of Columbus*, 194 F.3d 737, 752 (6th Cir.1999)(noting that a temporary suspension with pay is not an adverse employment action). Therefore, we conclude that Plaintiff has established a *prima facie* case of retaliation.

■ Nonetheless, Plaintiff has not overcome the County's legitimate non-discriminatory reason for the suspension, namely that Plaintiff was being disciplined for failing to abide by the jail's security regulations—something for which she had been disciplined before in the past. Although Plaintiff was exonerated from the criminal charges of excessive force, this does not mean that she did not violate a security regulation. Plaintiff has submitted no evidence from which a reasonable jury could conclude that the County's reason for the one-day suspension was a pretext. *See Irvin v. Airco Carbide*, 837 F.2d 724, 726 (6th Cir.1987)(A "blanket denial [of] the employer's articulated reasons ... is not enough; a plaintiff must take the extra step of presenting evidence to show that the reasons given are an attempt to cover up the employer's alleged real discriminatory motive."). Therefore, we dismiss this claim.

### III. *Count Three: Section 1983*

■ This is the most unclear of Plaintiff's claims. Apparently, she wants to hold the County liable for an unconstitutional policy or custom under *Monell v. Department of Soc. Servs. of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In order to state a claim against a city or a county under § 1983, a plaintiff must show that his injury was caused by an unconstitutional "policy" or "custom" of the municipality. *Id.; see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Here, Plaintiff claims that County maintained a policy and practice of discriminating against females for the position of road patrol officer. She applied for this position twice—both in the Spring and Fall of 2001. Yet, each time she withdrew her application without telling anyone why. Now, she claims that it was because various people insinuated she slept with people to get jobs. In any event, the case law is clear that a *single* incident generally does not constitute a "pattern" or "policy" that can subject the employer to liability. *See, e.g., Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* ... [W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation."); *Gailor v. Armstrong*, 187 F.Supp.2d 729, 734 (W.D.Ky.2001)("It is only common sense that one incident of policy deviation, however flagrant, cannot establish custom."). Here, Plaintiff provides no evidence to substantiate a *Monell* claim, even if Defendants discriminated against her by not giv-

ing her the road patrol position or created a hostile working environment which forced her to withdraw her application. At most, it would have been a *single* incident (and the County clearly had a constitutional policy against sexual harassment and retaliation, and Plaintiff submits no evidence that this policy was flagrantly not enforced).

■ As for her individual claims under Section 1983 against Homan and Bezotte, as discussed before, they took appropriate remedial action even if there was an objectively hostile working environment (which the Court doubts). In sum, although Plaintiff's counsel at the hearing emphasized that the County had a custom of ignoring its written policy and condoning harassment and retaliation against Plaintiff, the evidence (including the internal investigation and discipline) is to the contrary. "The nonmoving party must 'do more than simply show that there is some metaphysical doubt as to the material facts.' If the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party, the motion should be granted." *Cox v. Kentucky Dept. of Transportation,* 53 F.3d 146 (6th Cir.1995). Therefore, we dismiss this count.

### IV. *Count Four: Retaliatory Harassment under Title VII*

While this count is, perhaps, Plaintiff's strongest, she still ultimately loses. She claims that after the July 31, 2001 investigatory report and August 2001 discipline, co-workers started to harass her more frequently, which resulted in her having to resign her employment in January 2003.

She cites 18 examples of this so-called harassment.

■ In *Morris v. Oldham County Fiscal Court,* 201 F.3d 784 (6th Cir.2000), the Sixth Circuit recognized a cause of action for supervisor retaliatory harassment (where the harassment itself is the adverse employment action.) To establish such a cause of action, a plaintiff must prove that: (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment *by a supervisor;* and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Id.* at 792. Significantly, in a footnote, the *Morris* court stated: "We today take no position on whether an employer can be liable for *co-workers'* retaliatory harassment." *Id.* at 791, n. 8 (emphasis added).

This important distinction was not noted by counsel on either side, although they both cite *Morris.* After some research into the issue, we conclude that, while the Sixth Circuit has not definitively ruled on the issue,[10] many circuits which have addressed the issue have recognized a cause of action for co-worker retaliatory harassment. *See, e.g., Richardson v. New York State Dept. of Correctional Service,* 180 F.3d 426, 446 (2nd Cir.1999)("[A]n employer [can] be held accountable for allowing retaliatory co-worker harassment to occur if it knows about that harassment but fails to act to stop it."); *Gunnell v. Utah Valley State College,* 152 F.3d 1253, 1265 (10th

---

10. *See Diamond v. United States,* 29 Fed.Appx. 207, 216, 2002 WL 21995, *7 (6th Cir.2002) (unpublished) (noting that while the Sixth Circuit has not taken a position on whether an employer can be held liable for co-workers' retaliatory harassment, most circuits which have addressed the issue have allowed such a cause of action); *Barton v. UPS,* 175 F.Supp.2d 904, 909 (W.D.Ky.2001) ("The Court of Appeals for the Sixth Circuit has never conclusively ruled whether an employer can be liable for co-workers' retaliatory harassment, though in dicta it has suggested that one can.").

Cir.1998)("[A]n employer can [ ] be liable for co-workers' retaliatory harassment where its supervisory or management personnel either (1) orchestrate the harassment or (2) know about the harassment and acquiesce in it in such a manner as to condone and encourage the co-workers' actions."); *Knox v. State of Indiana,* 93 F.3d 1327, 1334 (7th Cir.1996)("Nothing indicates why a different form of retaliation—namely, retaliating against a complainant by permitting her fellow employees to punish her for invoking her rights under Title VII—does not fall within the statute.").

■ Assuming the Sixth Circuit would recognize a cause of action for co-worker retaliatory harassment (which is not at all certain), Plaintiff, nonetheless, still loses at this stage. For Plaintiff to withstand Defendants' summary judgment motion here, she must establish two things. First, she must submit enough evidence to establish that the alleged harassment itself (i.e. the 18 incidents) was sufficiently severe or pervasive. *See Ceckitti v. City of Columbus,* 14 Fed.Appx. 512, 518, 2001 WL 814935, *4 (6th Cir.2001)(unpublished) (noting that "proper application of Title VII to employment claims is meant to filter out complaints attacking 'the ordinary tribulations of the workplace.' Just as conduct must be 'extreme' to amount to a change in the terms and conditions of employment, *it must also be extreme to constitute severe and pervasive retaliatory harassment.*") (citations omitted) (emphasis added); *Hardy v. Potter,* 191 F.Supp.2d 873, 883 (E.D.Mich.2002) ("Retaliatory harassment by a supervisor does not, in and of itself, constitute a tangible employment action. The action by the supervisor must be 'severe or pervasive' as to alter the conditions of the victim's employment and create an abusive working environment.") (citations omitted).

Second, even assuming that the co-worker retaliatory harassment was objectively severe, Plaintiff must establish that her employer (the County) acquiesced or condoned the retaliatory behavior. In *Farra v. General Motors Corp.,* 163 F.Supp.2d 894 (S.D.Ohio 2001), the court—while recognizing that the Sixth Circuit had not yet definitively ruled on whether there was a viable cause of action under Title VII for co-worker retaliatory harassment—assumed there was such a cause of action but, nonetheless, granted summary judgment to the employer on the co-worker retaliatory harassment claim. Significantly, the court noted that there was no evidence that the employer "condoned and encouraged" the co-workers' retaliatory behavior. 163 F.Supp.2d at 914.

■ Thus, the pivotal questions in the case *sub judice* are (1) whether the harassment was sufficiently severe, and (2) whether the County condoned and encouraged the alleged retaliatory behavior by the co-workers. With respect to the first inquiry, in analyzing cases for supervisor retaliatory harassment, courts have noted that the harassment must create working conditions that are so difficult or unpleasant that a reasonable person would feel compelled to resign. *Mast v. IMCO Recycling,* 58 Fed.Appx. 116, 123, 2003 WL 247109, *6 (6th Cir. Feb.3, 2003) (unpublished). Assuming Ash's unwanted e-mails and contact ceased in August 2001 (and the record does not suggest otherwise), Plaintiff has not established that the alleged harassment was so objectively unreasonable that she was forced to resign. As *Mast* noted, staring at someone, without more, is not generally sufficient to create a hostile work environment. *Id.* Here, many of Plaintiff's 18 allegations of harassment concern her perception that fellow co-workers were staring at or shunning her.

Moreover, with respect to the County, Plaintiff has not submitted any evidence that her employer acquiesced to the alleged harassment. While, in August 2001,

discipline was meted out to various employees who had participated in rumors, and Ash was counseled repeatedly to cease all contact with Plaintiff, Plaintiff's claim for retaliatory harassment appears to be for harassment which occurred *after* August 2001. Plaintiff argues that—after August 2001—the County failed to take any action to discipline employees. Yet, when the evidence is viewed in the light most favorable to Plaintiff as we are constrained to do, the conduct of Defendants simply does not rise to the level of encouraging or condoning harassing behavior by co-workers (assuming the harassing behavior was even actionable). In sum, the Court finds that the 18 incidents mentioned were not severe enough to constitute actionable harassment, and the Court finds no evidence that the County condoned the alleged harassment. Therefore, this claim is dismissed as well.

### ORDER

It is hereby **ORDERED** that Defendants' motion for summary judgment is **GRANTED.**